# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | 3:26-cr-00205-SI |
| v. | **INDICTMENT** |
| DAVID STARLING and BENJAMIN YOUNG, | 18 U.S.C. §§ 371, 1343 |
| Defendants. | Forfeiture Allegation |

## THE GRAND JURY CHARGES:

## INTRODUCTION

At all times relevant to this Indictment, unless otherwise indicated:

**A.** **The Defendants and Relevant Entities, Individuals, and Bank Accounts**

1. Defendant DAVID STARLING ("STARLING") resided in Provo, Utah. STARLING was a tax preparer who was also an Enrolled Agent for the Internal Revenue Service ("IRS"). STARLING owned or controlled the following entities:

   A) Gladys' Multiservices, LLC ("Gladys' Multiservices"), which is an entity doing business as Tax Pro of Provo ("Tax Pro"). In 2019, Gladys' Multiservices reported 4 employees to the IRS, to which it paid $29,187 in gross wages.

B) Star Property Holdings of Utah, LLC ("Star Property Holdings"). In 2019, Star Property Holdings reported zero employees to the IRS, to which it paid $0 in gross wages.

C) Immigration Solutions, LLC ("Immigration Solutions"). In 2019, Immigration Solutions reported zero employees to the IRS, to which it paid $0 in gross wages.

2.    STARLING was a joint owner of Utah Community Credit Union account ending in 6800.

3.    Defendant BENJAMIN YOUNG ("YOUNG") resided in Provo, Utah. YOUNG was STARLING's son-in-law and owned or controlled the following entities:

A) Square the Books, LLC ("Square the Books"). In 2019, Square the Books reported 2 employees to the IRS, to which it paid $4,000 in gross wages.

B) Young Properties, LLC ("Young Properties"). In 2019, Young Properties reported 0 employees to the IRS, to which it paid $0 in gross wages.

4.    YOUNG was a Certified Public Accountant and employed full-time as the Financial Manager of a Utah non-profit organization ("VNPO"), located in a commercial building in Provo, Utah.

5.    As VNPO's Financial Manager, YOUNG had control over and signatory authority on VNPO's Bonneville Bank accounts ending in 7121 and 2217.

6.    YOUNG applied for two Paycheck Protection Program Loans on VNPO's behalf:

A) On or about August 12, 2020, the SBA funded loan 54334482-09 for $852,115 into VNPO's Bonneville account ending in 7121.

**Indictment**                                                                                    **Page 2**

B) On or about February 10, 2021, the SBA funded loan 58988884-08 for $843,595 into VNPO's Bonneville account ending in 2217.

7.     YOUNG was a joint owner with his wife of a personal account at USAA Bank ending in 6559.

8.     On or about January 21, 2021, YOUNG opened an investment brokerage account ending in 1713 on behalf of VNPO at TD Ameritrade.  While YOUNG was authorized to open this account by his employer, YOUNG had sole authority over all funds in this account.

9.     On or about February 17, 2021, YOUNG opened a personal investment brokerage account ending in 6098 at TD Ameritrade.  YOUNG had sole authority over all funds in this account.

10.     Co-Conspirator 1, an individual whose identity is known to the Grand Jury, resided in Sherwood, Oregon.  Co-Conspirator 1 is STARLING's brother.  Co-Conspirator 1 owned or controlled the following entities:

A) Starling CPA, LLC ("Starling CPA"), which is an entity located in Sherwood, Oregon.  In 2019, Starling CPA reported 0 employees to the IRS, to which it paid $0 in gross wages.

B) Kaitlyn's Cases.  In 2019, Kaitlyn's Cases reported 0 employees to the IRS, to which it paid $0 in gross wages.

11.     Co-Conspirator 1 and STARLING owned or controlled Lake Oswego Property Management, LLC ("L.O. Property Management"), which is an entity located in Lake Oswego, Oregon.  In 2019, L.O. Property Management reported 0 employees to the IRS, to which it paid $0 in gross wages.

**Indictment**                                                                                           **Page 3**

12.     The IRS was an agency of the United States Department of the Treasury responsible for administering and enforcing federal tax laws of the United States, including refundable tax credits, and collecting taxes owed to the United States.

13.     Federal law required employers to collect, truthfully account for, and pay over to the United States certain payroll taxes, including their employees' withheld federal income taxes, Social Security and Medicare taxes, and the employer's matching portion of the Social Security and Medicare taxes.  A responsible person at a business was required to file, quarterly, an Employer's Quarterly Federal Tax Return, Form 941 ("Form 941"), reporting certain information and assessing payroll taxes for the business and reporting certain information, including the number of employees working at the business and the wages paid by the business.

14.     A Wage and Tax Statement, Form W-2 ("Form W-2"), reported wages paid by an employer to an employee and taxes withheld from those wages.  It was issued by United States employers to employees and filed by employers with the Social Security Administration.

15.     The Small Business Administration ("SBA") was an executive branch agency of the United States government that provided support to entrepreneurs and small businesses. The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters.

16.     A tax return was a filing with the IRS which detailed the tax obligations of the taxpayer or organization.  Tax returns in the United States included, among others, Form 941 and Form 1040.

/ / /

**Indictment**                                                                                          **Page 4**

**B.    COVID-19 Disaster Loans and Programs**

17.    On March 27, 2020, President Trump signed the Coronavirus Aid, Relief, and Economic Security ("CARES") Act into law.

18.    The CARES Act provided for an employee retention credit ("ERC"), a refundable tax credit created to encourage employers to retain and pay employees during the COVID-19 pandemic.  The Taxpayer Certainty and Disaster Tax Relief Act of 2020 and the American Rescue Plan Act ("ARPA") modified and extended the ERC.

19.    Eligible employers under the ERC were those who incurred a suspension of operation due to COVID-19 or a decline in gross receipts.

### a.    Qualified Sick and Family Leave

20.    The Qualified Sick and Family Leave Credits ("SFLC") and Qualified Family Leave Credit ("QFLC") were refundable tax credits introduced under the Families First Coronavirus Response Act ("FFCRA") to reimburse employers for providing paid sick and family leave to employees affected by COVID-19.  These credits were designed to support employees who were unable to work due to quarantine, illness, or caregiving responsibilities related to COVID-19.

21.    The ERC, SFLC and QFLC credits ("COVID-19 Related Tax Credits") were administered by the IRS and were available to employers only in 2020 and 2021.  The programs allowed refundable credits equal to a percentage of an employee's pay, subject to aggregate caps.

22.    An employer could claim COVID-19 Related Tax Credits by filing a Form 941 with the IRS for the relevant quarter.  The Form 941 required an employer to provide the IRS

**Indictment**                                                                                           **Page 5**

information about the number of employees the business had and the wages paid by the business to employees during that quarter.

### b. Paycheck Protection Program

23.    The CARES Act also created the Paycheck Protection Program ("PPP"), which authorized the SBA to guarantee loans of up to $10,000,000 to qualifying employers without collateral or personal guarantees from the borrowers. The Act required lenders making loans under the PPP to defer all repayment obligations for not less than six months on such loans and required borrowers to certify, among other things, that the borrowed "funds [would] be used to retain workers and maintain payroll or make mortgage payments, lease payments, and utility payments."

24.    Pursuant to the CARES Act, the amount of PPP funds a business was eligible to receive was determined by the number of employees the business employed and their average payroll costs.

25.    The PPP allowed qualifying small businesses and other organizations to receive unsecured SBA-guaranteed loans.

26.    The PPP allowed the interest and principal to be forgiven if businesses spent the proceeds on approved expenses under certain conditions.

27.    Businesses applying for a PPP loan had to provide documentation to confirm that they had in the past paid employees the compensation represented in the loan application.

28.    The PPP is overseen and administered by the SBA, which has authority over all PPP loans, but individual PPP loans were issued by approved commercial lenders who received

**Indictment**                                                                 **Page 6**

and processed PPP applications and supporting documentation. The SBA paid fees to these commercial lenders to finance PPP loans.

29.    The first round of PPP closed to new applications on August 8, 2020. On December 27, 2020, the Consolidated Appropriations Act of 2021, which included the Economic Aid to Hard-Hit Small Businesses, Nonprofit, and Venues Act (the "Relief Act") was signed into law, providing additional funding for the PPP. Under the Relief Act, certain businesses that already obtained a PPP loan under the original PPP were eligible for an additional "second draw" PPP loan, provided they met certain requirements. The Relief Act also re-opened the application period for "first draw" PPP loans to businesses that had not been approved for a "first draw" loan prior to August 8, 2020, or who may have been eligible to receive more funds during the "first draw" period than they actually received. Borrowers through the PPP second draw program are also eligible to apply for loan forgiveness once all loan proceeds for which forgiveness is requested have been used.

30.    To obtain a PPP loan, an applicant was required to provide business information, including number of employees, average monthly payroll, and operation date. An applicant was required to provide supporting documentation, such as payroll documentation, supporting what payroll taxes were reported to the IRS, typically including IRS Forms 940, 941, 1040s, Schedule C's, W-2s, and W-3s, to corroborate information submitted in the application. The applicant was required to certify all information in the application was true and correct to the best of the applicant's knowledge.

31.    PPP loan applications were submitted over the Internet by participating commercial lenders via the SBA's computer servers. PPP loan applications submitted after

**Indictment**                                                                                             **Page 7**

January 11, 2021, were received by servers in Oregon and transmitted to servers in Virginia via wire.

32.    PPP loan forgiveness applications were submitted over the Internet via the SBA's computer servers. All PPP loan forgiveness applications were received by servers in Oregon and transmitted to servers in Virginia via wire.

### c.    Preferred Lender Program ("PLP")/7(A) Loan Program

33.    The 7(a) Loan Program, otherwise known as the Preferred Lender Program ("PLP") was a loan program offered by the SBA for up to $5 million to finance the purchase or start-up of, or for working capital for, small businesses. PLP Loans were offered to small businesses or individuals seeking to buy or improve small businesses who might not be eligible for business loans through normal lending channels.

34.    A PLP lender complying with SBA underwriting guidelines was eligible for a SBA guarantee of a substantial part of the loan in the event of a borrower's default. Both the PLP lender and the SBA must approve the loan for the SBA guarantee to attach.

35.    PLP lenders and the SBA relied on the applicants' truthfulness in statements made on PLP applications and in related documents, or provided through escrow holders or business brokers, and on the genuineness of documents submitted in support of applications, to determine whether to approve PLP loans.

36.    Mountain America Credit Union in Utah & the West ("MACU") was a lender participating in the PLP.

/ / /

/ / /

**Indictment**                                                                 **Page 8**

## COUNT 1
### (Conspiracy to Defraud the United States)
### (18 U.S.C. § 371)
### (DAVID STARLING AND BENJAMIN YOUNG)

37.    The allegations in paragraphs 1 through 36 of this Indictment are incorporated as though realleged here.

## THE OBJECTS OF THE CONSPIRACY

38.    Starting in 2020, and continuing through at least in or about October 2021, in the District of Oregon and elsewhere, STARLING, YOUNG, Coconspirator 1 (collectively, the "CONSPIRATORS"), and unnamed coconspirators, known and unknown to the grand jury, unlawfully, voluntarily, intentionally and knowingly conspired, combined, confederated, and agreed together and with each other and with other individuals both known and unknown to the grand jury:

A) To defraud the United States for the purpose of impeding, impairing, obstructing, and defeating the lawful government functions of the Internal Revenue Service of the Treasury Department, through deceitful and dishonest means, in the ascertainment, computation, assessment, and collection of the revenue, that is the administration and distribution of COVID-Related Tax Credits; and

B) To defraud the Small Business Administration, an agency of the United States, through deceitful and dishonest means, in its administration of the Payroll Protection Program and Preferred Lender/7(a) Program.

///

///

///

**Indictment**                                                                                      **Page 9**

**MANNER AND MEANS BY WHICH THE CONSPIRACY WAS CARRIED OUT**

The Manner and Means by which the conspiracy was sought to be accomplished included, among others, the following:

*Wage Manufacturing Scheme*

39.    Starting in 2020, the CONSPIRATORS engaged in a scheme to fabricate wages paid to individuals purported to be employees ("purported employees") of their businesses by creating paperwork making it appear that the CONSPIRATORS had paid wages to the purported employees working for the businesses the CONSPIRATORS owned or controlled, when in fact these wages had not been paid to the purported employees. The CONSPIRATORS then used that false information to fraudulently obtain COVID-Related Tax Credits in 2020 and 2021.

40.    The CONSPIRATORS shared the names of themselves, their spouses, their children, including YOUNG's two-year old twins, and others, and listed them as purported employees for 2020 and 2021 for companies the CONSPIRATORS controlled even though the CONSPIRATORS knew the purported employees were not actual employees of their companies.

41.    The CONSPIRATORS issued checks to the purported employees which the CONSPIRATORS falsely characterized as wages.

42.    The CONSPIRATORS filed or caused to be filed Forms 941 primarily from Q4 2020 through Q3 2021 and requested refundable tax credits for a large part of their fraudulent payroll. Amounts listed as wages in the Forms 941 were false and did not reflect the amount of legitimate wages paid, or amounts paid for the retention of an employee or paid leave, but were instead fabricated or devised by the CONSPIRATORS based on the maximum amounts of wages and benefits provided to employees that were subject to the credits. The CONSPIRATORS filed

**Indictment**                                                    **Page 10**

or caused to be filed false Forms 941 with the IRS seeking COVID-19 Related Tax Credits for

businesses they owned or controlled as follows:

| Entity Filing Form 941 | QTR | Tax Year | Date Filed | Total Amount of Claimed COVID-19 Related Tax Credits | |
|---|---|---|---|---|---|
| STARLING CPA | Q4 | 2020 | 02/01/2021 | $ | 135,824.76 |
| | Q1 | 2021 | 04/12/2021 | $ | 98,441.93 |
| | Q2 | 2021 | 07/23/2021 | $ | 35,666.30 |
| KAITLYN'S CASES | Q4 | 2020 | 02/01/2021 | $ | 31,798.19 |
| | Q1 | 2021 | 04/12/2021 | $ | 126,559.38 |
| | Q2 | 2021 | 07/23/2021 | $ | 28,579.90 |
| LAKE OSWEGO PROPERTY MANAGEMENT | Q4 | 2020 | 01/13/2021 | $ | 24,670.00 |
| | Q1 | 2021 | 04/26/2021 | $ | 54,372.38 |
| | Q2 | 2021 | 07/23/2021 | $ | 94,952.38 |
| | Q3 | 2021 | 10/25/2021 | $ | 20,565.00 |
| GLADYS' MULTISERVICES/TAX PRO | Q2 | 2020 | 07/18/2020 | $ | 19,675.37 |
| | Q4 | 2020 | 01/06/2021 | $ | 48,278.24 |
| | Q1 | 2021 | 04/29/2021 | $ | 277,348.29 |
| | Q2 | 2021 | 07/31/2021 | $ | 225,735.05 |
| | Q3 | 2021 | 10/30/2021 | $ | 75,244.42 |
| IMMIGRATION SOLUTIONS | Q4 | 2020 | 01/02/2021 | $ | 52,236.19 |
| | Q1 | 2021 | 04/29/2021 | $ | 27,186.19 |
| | Q2 | 2021 | 07/31/2021 | $ | 71,214.29 |
| | Q3 | 2021 | 10/30/2021 | $ | 13,710.00 |
| STAR PROPERTY HOLDINGS OF UTAH | Q4 | 2020 | 01/13/2021 | $ | 8,760.00 |
| | Q4 | 2020 | 02/03/2021 | $ | 17,520.00 |
| | Q1 | 2021 | 04/29/2021 | $ | 115,251.76 |
| | Q2 | 2021 | 07/31/2021 | $ | 84,741.57 |
| | Q3 | 2021 | 10/30/2021 | $ | 59,982.89 |
| SQUARE THE BOOKS | Q2 | 2020 | 07/30/2020 | $ | 20,166.00 |
| | Q3 | 2020 | 10/30/2020 | $ | 2,803.20 |
| | Q4 | 2020 | 01/22/2021 | $ | 15,482.40 |
| | Q4 | 2020 | 02/16/2021 | $ | 130,428.57 |
| | Q1 | 2021 | 10/18/2021 | $ | 190,385.12 |
| | Q2 | 2021 | 09/27/2021 | $ | 227,642.86 |
| | Q3 | 2021 | 10/11/2021 | $ | 144,770.87 |
| YOUNG PROPERTIES | Q4 | 2020 | 02/01/2021 | $ | 143,324.76 |
| | Q1 | 2021 | 04/26/2021 | $ | 106,652.38 |
| | Q2 | 2021 | 07/24/2021 | $ | 180,166.67 |
| | Q3 | 2021 | 10/11/2021 | $ | 118,644.00 |
| | | | | $ | 3,028,781.31 |

43.    The CONSPIRATORS used information from their wage manufacturing scheme to fraudulently obtain benefits. Relying on the false information provided by the CONSPIRATORS in 2020 and 2021, the IRS issued Covid-related program benefits (ERC, SFLC and QFLC) to the companies owned or controlled by the CONSPIRATORS in the amount of $3,028,781.31.

44.    In many instances, the CONSPIRATORS used proceeds from their wage manufacturing tax credit scheme to pay the payroll taxes generated by the scheme.

45.    The CONSPIRATORS also used their wage manufacturing scheme, including the false documents filed with the IRS, to defraud the SBA by submitting or causing to be submitted fraudulent PPP applications for businesses they owned or controlled on which they misrepresented the true number of employees and average monthly payroll for the applicant entities, and misrepresented that the information in the application and the supporting documents was true and accurate.

46.    Relying on the false information provided by the CONSPIRATORS, the lending institutions granted the PPP loans, and the SBA approved the guarantees associated with Starling CPA, Square the Books, and Young Properties.

47.    After receiving the PPP loan funds, the CONSPIRATORS then submitted or caused to be submitted fraudulent PPP forgiveness applications for the loans on which they misrepresented the number of true employees at the time of the loan applications and time of forgiveness applications, that all PPP loan proceeds had been spent on payroll, and that the information in the forgiveness applications was true and correct.

/ / /

**Indictment**                                                                                               **Page 12**

48.    The PPP applications and PPP forgiveness applications were submitted via interstate wire through Oregon as follows:

| Date | Applicant Entity | Loan or Forgiveness | Loan Amount | Fees | Forgiveness Interest |
|---|---|---|---|---|---|
| 2/27/2021 | Square the Books | Loan #53999285-00 | $42,887 | $2,500 | |
| 6/18/2021 | Square the Books | Forgiveness #53999285-00 | N/A | | $137 |
| 3/23/2021 | Young Properties | Loan #47771586-07 | $33,887 | $2,500 | |
| 6/18/2021 | Young Properties | Forgiveness #47771586-07 | N/A | | $86.60 |
| 4/6/2021 | Young Properties | Loan #77021987-05 | $33,887 | $2,500 | |
| 7/20/2021 | Young Properties | Forgiveness #77021987-05 | N/A | | $103.54 |
| 4/19/2021 | Square the Books | Loan #58270288-03 | $42,887 | $2,500 | |
| 7/28/2021 | Square the Books | Forgiveness #58270288-03 | N/A | | $125.09 |
| 4/21/2021 | Starling CPA | Loan #99236088-09 | $36,850 | $2,500 | |
| 6/25/2021 | Starling CPA | Forgiveness #99236088-09 | N/A | | $64.49 |

*Purchase of the VNPO Property with Criminally Derived Money*

49.    During the conspiracy, YOUNG, through his company, Square the Books, purchased part of the commercial building where his VNPO employer was located (the "VNPO Property"). The purchase price was $3.5 million.

50.    Part of the funds used by YOUNG to buy the VNPO Property were proceeds of the wage manufacturing scheme provided by STARLING.

51.    To obtain additional funds he needed to buy the VNPO Property, YOUNG diverted approximately $2.7 million from VNPO. This amount consisted of approximately $850,000, which VNPO had received from two PPP loans YOUNG had applied for and obtained on VNPO's behalf and an additional approximate $1.85 million YOUNG embezzled from VNPO.

52.    YOUNG closed on the VNPO property on or about June 30, 2021.

///

///

**Indictment**                                                                                          **Page 13**

*YOUNG and STARLING Conspired to Fraudulently Obtain a $2.5 Million PLP/7a Loan Through SBA*

53.    Less than two weeks after YOUNG purchased the VNPO property, he attempted to repay VNPO the funds he had embezzled from VNPO. To do so, YOUNG applied for an SBA PLP/7a loan for $2.5 million, through Mountain America Credit Union ("MACU").

54.    To help convince MACU to grant the application for the SBA PLP/7a loan, YOUNG and STARLING created false documents making it appear that STARLING had loaned YOUNG $2.5 million for the purchase of the VNPO property.

55.    Specifically, YOUNG submitted documents to MACU which included a promissory note stating that STARLING had loaned YOUNG's company, Square the Books, $2.5 million to buy the VNPO Property.

56.    Along with this promissory note, YOUNG provided MACU a payoff statement signed by STARLING, which affirmed that Square the Books owed STARLING $2.5 million.

57.    The loan documents, later approved, stated that the PLP/7(a) loan funds would be sent to STARLING so that the promissory note could be paid by YOUNG for Square the Books.

58.    In reality, the promissory note was false and STARLING had not lent $2.5 million to YOUNG or Square the Books.

59.    Relying on the false documents and false statements provided by YOUNG and STARLING, MACU agreed to fund the PLP/7(a) loan.

60.    The PLP/7(a) loan proceeds were wired to STARLING. On the same day, STARLING wired $2.4 million of those funds to VNPO's TD Ameritrade account.

61.    Using his authority over VNPO's TD Ameritrade account, YOUNG quickly transferred the PLP/7(a) loan proceeds to his own TD Ameritrade account.

**Indictment**                                                                 **Page 14**

62.    YOUNG transferred $150,000 of the PLP/7(a) loan proceeds from his TD Ameritrade account to an account he used Square the Books, and then issued "payroll" checks to STARLING, STARLING's wife, and to Coconspirator 1, which funds were used as part of the wage manufacturing scheme.

63.    YOUNG transferred an additional $150,000 of the PLP/7(a) loan proceeds from his TD Ameritrade account to an account he used for another one of his businesses, Young Properties, and then issued "payroll" checks to STARLING, STARLING's wife, and to Coconspirator 1, which funds were used as part of the wage manufacturing scheme.

64.    YOUNG used approximately $572,000 of the PLP/7(a) loan proceeds to purchase a condominium occupied by his relatives.

65.    YOUNG also used the PLP/7(a) loan proceeds to engage in speculative options trading. YOUNG transferred approximately $1.37 million of the PLP/7(a) loan proceeds to fund his options trading. These trades were largely unsuccessful and YOUNG lost virtually all of the funds.

## OVERT ACTS

During and in furtherance of the conspiracy, and to effect the objects thereof, the following overt acts were committed in the Districts of Oregon, Utah, and elsewhere:

Overt Act 1:  On or about December 20, 2020, YOUNG issued two $25,360.08 checks to STARLING and STARLING'S wife.

Overt Act 2:  On or about December 20, 2020, STARLING issued or caused the issuance of two checks for $9,235 to Coconspirator 1 and Coconspirator 1's wife in Oregon.

Overt Act 3:  On or about March 19, 2021, STARLING issued two $25,036.08 checks to Coconspirator 1 and Coconspirator 1's wife in Oregon.

Overt Act 4:  On or about March 18, 2021, Coconspirator 1 issued two checks for $18,470 to STARLING and STARLING's wife in Oregon.

Overt Act 5:  From on or about July 18, 2020, through on or about October 30, 2021, YOUNG, STARLING, and Coconspirator 1 filed or caused to be filed false Forms 941 with the IRS for their businesses.

Overt Act 6:  From on or about February 27, 2021, through on or about July 28, 2021, YOUNG and STARLING submitted or caused to be submitted fraudulent PPP loan applications and PPP forgiveness applications.

Overt Act 7:  On or about June 25, 2021, YOUNG submitted a promissory note to MACU purportedly signed by YOUNG and STARLING.

Overt Act 8:  On or about August 4, 2021, YOUNG submitted a payoff statement to MACU purportedly signed by STARLING.

Overt Act 9:  On or about August 5, 2021, STARLING transferred $2,400,000 to VNPO's TD Ameritrade account ending in 1713.

Overt Act 10:  On or about August 10, 2021, YOUNG transferred $2,375,000 from VNPO's TD Ameritrade account ending in 1713 to his personal TD Ameritrade account ending in 6098.

Overt Act 11:  From on or about August 11, 2021, through on or about September 15, 2021, YOUNG transferred a total of approximately $1,799,325.34 derived from the

fraudulent PLP/7(a) loan from YOUNG's personal TD Ameritrade account ending in 6098 into accounts YOUNG controlled.

Overt Act 12:  On or about August 11, 2021, YOUNG transferred $300,000 to accounts YOUNG controlled for his businesses, Young Properties and Square the Books, and then used these funds to cover "payroll" checks to STARLING, STARLING's wife, and Coconspirator 1.

Overt Act 13: The CONSPIRATORS engaged in numerous telephone calls during which they discussed which individuals to add to each of their companies' "payroll" and the amounts to pay those purported employees.

All in violation of 18 U.S.C. § 371.

### COUNTS 2-13
### (Wire Fraud)
### (18 U.S.C. § 1343)
### (BENJAMIN YOUNG)

66.    The allegations in paragraphs 1 through 65 of this Indictment are incorporated as though realleged herein.

### SCHEME TO DEFRAUD

67.    Between in or about February 2021 and in or about July 2021,  BENJAMIN YOUNG used the wage manufacturing scheme described above, including the false documents filed with the IRS, to defraud the SBA by submitting or causing to be submitted fraudulent PPP applications and forgiveness applications for businesses YOUNG owned or controlled in which YOUNG misrepresented the true number of employees and average monthly payroll for the applicant entities, and misrepresented that the information in the application and the supporting

**Indictment**                                                                                          **Page 17**

documents was true and accurate. These applications and forgiveness applications were sent via interstate wire through Oregon.

68. On or about November 6, 2020, and June 12, 2021, YOUNG submitted fraudulent PPP forgiveness applications for VNPO's PPP loans 54334482-09 and 58988884-08, in which YOUNG knowingly misrepresented that the entirety of the loans had been spent on VNPO's payroll and that information in the applications and supporting documents was true and accurate, causing the lending institution and the SBA to forgive these PPP loans. These forgiveness applications were sent via interstate wires through Oregon.

69. On or about the dates set forth below in each count, in the District of Oregon and elsewhere, YOUNG, for purposes of executing and attempting to execute the material scheme to defraud, as described above and in Count 1 of this Indictment, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowingly submitted or caused to be submitted the following communications via wire in interstate or foreign commerce:

| Count | Approximate Date | Interstate Communication |
|---|---|---|
| 2 | 11/6/2020 | Forgiveness Application for PPP Loan 54334482-09 for VNPO |
| 3 | 4/21/2021 | Application for PPP Loan 99236088-09 for Starling CPA |
| 4 | 6/25/2021 | Forgiveness Application for PPP Loan 99236088-09 for Starling CPA |
| 5 | 2/27/2021 | Application for PPP Loan 53999285-00 for Square the Books |
| 6 | 3/23/2021 | Application for PPP Loan 47771586-07 for Young Properties |
| 7 | 4/6/2021 | Application for PPP Loan 77021987-05 for Young Properties |
| 8 | 4/19/2021 | Application for PPP Loan 58270288-03 for Square the Books |
| 9 | 6/12/2021 | Forgiveness Application for PPP Loan 58988884-08 for VNPO |
| 10 | 6/18/2021 | Forgiveness Application for PPP Loan 53999285-00 for Square the Books |
| 11 | 6/18/2021 | Forgiveness Application for PPP Loan 47771586-07 for Young Properties |

**Indictment**                                                                                          **Page 18**

| 12 | 7/20/2021 | Forgiveness Application for PPP Loan 77021987-05 for Young Properties |
| 13 | 7/28/2021 | Forgiveness Application for PPP Loan 58270288-03 for Square the Books |

All in violation of 18 U.S.C. § 1343.

## FIRST FORFEITURE ALLEGATION

70.    Upon conviction of any of the wire fraud offenses alleged in Counts 2-13, defendant BENJAMIN YOUNG shall forfeit to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) any property, real or personal, which constitutes or is derived from proceeds traceable to the violations, including but not limited to a money judgment for a sum of money equal to the amount of property involved in or derived from the offenses.

71.    If the above-described forfeitable property, as a result of any act or omission of defendants:

a.    cannot be located upon the exercise of due diligence;

b.    has been transferred or sold to, or deposited with, a third party;

c.    has been placed beyond the jurisdiction of the court;

d.    has been substantially diminished in value; or

e.    has been commingled with other property which cannot be divided without difficulty;

the United States of America shall be entitled to forfeiture of substitute property pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c).

///

///

///

**Indictment**                                                                 **Page 19**

Dated: June 9 , 2026

A TRUE BILL.

OFFICIATING FOREPERSON

Presented by:

SCOTT E. BRADFORD
United States Attorney

CHRISTOPHER L. CARDANI, MA #550609
MEREDITH D.M. BATEMAN, OSB #192273
Assistant United States Attorneys

**Indictment**

**Page 20**